# Exhibit
# 1

## PURCHASE AND SALE AGREEMENT

THIS AGREEMENT MADE THIS 18th day of January 2008, by and between

GOLD AND FARB, INC. and LYDMILA ROGALIN (hereinafter referred to as the

"Seller"), and EUGENE PEELIKHOV (hereinafter referred to as the "Buyer").

WHEREAS, the Seller desires to sell to the Buyer and the Buyer desires to buy

from the Seller a minority share of restricted stock being twenty five (25%) percent of all

the issued and outstanding shares of stock in Gold and Farb, Inc., which corporation

currently conducts its business at 145 Broad Street, Lynn, Massachusetts.

NOW THEREFORE, in consideration of the mutual promises, covenants and

agreements herein contained, the parties represent, warrant, covenant and agree as

follows:

1.      Purchase and Sale of minority share of restricted stock of Gold and Farb, Inc.

On the basis of the representations and undertakings set forth in this Agreement,

but subject to the terms and conditions set forth herein, the Seller agrees that it will sell

and, by good and sufficient bills of sale and instruments of assignment, the Seller agrees

that it will transfer, assign, and convey to the Buyer, and the Buyer agrees to purchase

from the Seller, 250 shares of the Common Stock of the Seller (the "Shares"), such

Shares to constitute twenty five percent (25%) of all of the issued and outstanding shares

of stock in the Company.

2.      Closing and Closing Date

Such purchase and sale of the minority share of restricted stock shall take place at

the offices of Stern, Keilty & Wall, LLC, One Salem Green, Suite 550, Salem,

Massachusetts, 01970 on or before January 18, 2008 at 11:00 AM or at such other time

and place as the Buyer and Seller shall mutually agree upon, such time being herein

referred to as the "Closing" or the "Closing Date." Time is of the essence of this

Agreement.

3.      Closing Matters

At the closing, in order to convey the stock to the Buyer as contemplated hereby,

the Seller shall execute and deliver to the Buyer proper documents authorizing the Seller

to transfer the stock and a duly executed stock certificate in Buyer's name representing

the Shares. A copy of the documents are attached as Exhibit A. The current Secretary of

the Corporation and director of the Corporation, Lydmila Rogalin, shall resign as

Secretary and director of the corporation and shall execute appropriate documentation to

effect said resignation. The Buyer shall be appointed director of the corporation and

Seller shall execute appropriate documentation to effect said appointment. The Seller

and Buyer shall also execute a Stockholders' Agreement, a copy of which is attached as

Exhibit B.

4.      Purchase Price and Allocation Thereof

In exchange for the stock from the Seller, the Buyer agrees to pay to the Seller the

sum of One Hundred Seventy Five Thousand and 00/100 Dollars ($175,000.00)

(hereinafter referred to as the "Purchase Price").

5.      Payment of Purchase Price

The Purchase Price shall be paid as follows:

The sum of One Hundred Twenty Six Thousand and 00/100 Dollars ($126,000)

was paid on October 18, 2007 as a deposit.

The sum of Twenty Four Thousand and 00/100 Dollars ($24,000.00) shall be paid at the closing by cash, certified check or treasurer's check.

The sum of Twenty Five Thousand and 00/100 Dollars ($25,000.00) shall be paid within thirty-six (36) months from the date of the closing, interest-free.

6.   Additional Terms.

a   Employment.

From and after the Closing and subject to the Stockholder Agreement, Buyer shall be employed at Seller's place of business at an agreed-upon rate as long as Buyer remains a shareholder.  The Buyer's base salary shall be $500.00 per week drawn from Seller's payroll account.  The Buyer shall also receive an additional $500.00 per week drawn from Seller's operating account.

b.  Board Seat.

From and after the Closing, Buyer shall and as long as Buyer remains a shareholder, Buyer shall have the right to appoint one person, either himself or a person so designated by the Buyer, to the Seller's board of directors.

c.  Future Sale of Assets or Stock.

During the period ending three (3) years after the Closing and without Buyer's written consent, which shall not be unreasonably withheld or delayed, there shall be no (i) sale or transfer of all assets by the Seller resulting in a distribution of less than $175,000 to Buyer.  Beginning three years after the closing date, Buyer shall have the right of first refusal for the sale or transfer of all assets by the Seller.

7.   Representations and Warranties

The Seller represents to the Buyer that as of the date of the Closing:

(i)     The Seller is the lawful owner of the Shares to be conveyed and

transferred pursuant to this Agreement; it has good right to sell the same;

it will warrant and defend the same against the lawful claims and demands

of all persons through it whomsoever.

(ii)    The Shares to be conveyed and transferred pursuant to this Agreement are

free from any security interests or other liens, claims or encumbrances of

any kind, nature or description.

(iii)   The Seller has paid all taxes, federal, state and local accruing prior to

Closing and will hold the Buyer harmless and indemnify the Buyer for any

liability arising by virtue of the Seller's failure to pay any of said taxes.

(iv)    The Seller is a corporation duly organized, validly existing and in good
standing under the laws of the Commonwealth of Massachusetts. The
Seller has all requisite corporate power and authority to own and operate
its properties and assets, to carry on its business as presently conducted
and as proposed to be conducted, to execute and deliver this Agreement,
and the Stockholder' Agreement (collectively, the "Transaction
Documents"), and to perform its obligations under each of the Transaction
Documents.

(v)     Seller is an S Corporation in accordance with certain provisions of the
Internal Revenue Code of 1986.

(vi)    All corporate action on the part of the Seller and its officers, directors and
stockholders necessary for the authorization of the Transaction
Documents, the performance of all obligations of the Company hereunder
and thereunder at the Closing, and the authorization, sale, issuance and
delivery of the Shares have been duly taken. This Agreement is, and each
of the Transaction Documents is or, when executed and delivered, will be
the valid and binding obligation of the Company enforceable against it in
accordance with its terms, except as limited by applicable bankruptcy,
insolvency, reorganization, moratorium or other laws of general
application affecting enforcement of creditors' rights or general principles
of equity that restrict the availability of equitable remedies.

(vii)    The authorized capital stock of the Seller (including the Shares) consists of one thousand (1,000) shares of Common Stock, of which one thousand (1,000) are issued and outstanding. There are no other class of stock except for the Common Stock. All issued and outstanding shares of the Seller's Common Stock have been duly authorized and validly issued, are fully paid and nonassessable, and were issued in compliance with all applicable state and federal securities laws. Except for this Agreement and the Stockholders' Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal), or agreements of any kind for the purchase or acquisition from the Seller of any of its securities. When issued in compliance with the provisions of this Agreement, the Shares will be validly issued, fully paid and nonassessable and will be free of any liens or encumbrances. Other than the Transaction Documents, there are no agreements, written or oral, between the Seller and any holder or prospective holder of the Seller's capital stock or, to the best of the Seller's knowledge, between or among any holders of the Seller's capital stock, relating to the acquisition, disposition or voting of such capital stock.

(viii)   The Seller has all the material permits, licenses, orders, franchises and other rights and privileges ("Permits") of all federal, state, or local governmental or regulatory bodies necessary for the Seller to conduct its business as presently conducted or as proposed to be conducted. All such Permits are in full force and effect and, to the knowledge of the Seller, no suspension or cancellation of any of them is threatened, and none of such Permits will be affected by the consummation of the transactions contemplated in this Agreement and the other Transaction Documents. No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of the Seller in connection with the execution, delivery and performance by the Seller of the Transaction Documents, or in connection with the issuance of the Shares, except for (i) those that have already been made or granted or that will be timely made under applicable securities law.

(ix)    There is no litigation or governmental proceeding or investigation pending or, to the knowledge of the Seller, threatened against the Seller or affecting any of the Seller's properties or assets, or against any director, officer, key employee or stockholder of the Seller in his or her capacity as such  nor, to the knowledge of the Seller, has there occurred any event or does there exist any condition on the basis of which any litigation, proceeding or investigation might properly be instituted.

(x)    The Seller is in compliance with all of the provisions of its Articles and By-Laws and of each judgment, decree, judicial order, statute, and regulation by which it is bound or to which it or any of its properties is subject, and is otherwise in compliance in all material respects with the provisions of each mortgage, indenture, lease, license, other agreement or instrument to which it is party or to which any of its assets is subject. The

Seller has never materially violated, and is presently in material compliance with, all federal, state, and local environmental and health and safety laws, rules, regulations, ordinances, and by-laws applicable to its business and properties. To the knowledge of the Seller, there is no contamination of any real property leased or operated by the Seller that could subject the Seller to liability under any environmental laws or regulations. Neither the Company nor any director, officer, key employee or stockholder of the Seller in his or her capacity as such, is, to the knowledge of the Company, in default with respect to any order, writ, injunction, decree, ruling or decision of any court, commission, board or other government agency, which default may materially and adversely affect the business or assets of the Seller taken as a whole. Neither the execution, delivery or performance of the Transaction Documents, including without limitation the offer, issuance, sale or delivery of the Shares, requires the consent or approval of any Person or, with or without the giving of notice or passage of time, or both, will violate, or result in any breach of, or constitute a default under, or result in the imposition of any encumbrance upon any asset of the Seller pursuant to any provision of its Articles or By-Laws, or of any statute, rule or regulation, contract, lease, judgment, order, decree or other document or instrument by which the Seller is bound or to which the Seller or any of its properties are subject, or will cause the Seller to lose the benefit of any right or privilege it presently enjoys.

(xi)     The Seller has filed all tax returns, reports and forms (including statements of estimated taxes owed) required to be filed within the applicable periods for such filings and has paid all taxes required to be paid, and has established adequate reserves (net of estimated tax payments already made) for the payment of all taxes payable in respect to the period subsequent to the last periods covered by such returns. All such tax returns, reports and forms are true, correct and complete. No deficiencies for any tax are currently assessed against the Seller, no tax returns of the Seller have ever been audited, and, to the knowledge of the Seller, there is no such audit pending or contemplated. Proper and adequate amounts have been withheld by the Seller from its employees and other persons for all periods in compliance in all material respects with the tax, social security and unemployment and other withholding provisions of all federal, state, local and foreign laws. There is no tax lien, whether imposed by any federal, state or local taxing authority, outstanding against the assets, properties or business of the Seller. For the purposes of this Agreement, the term "tax" shall include all federal, state, local and foreign taxes, including income, franchise, property, sales, use, gross receipts, excise, withholding, payroll and employment taxes and other similar assessments of any kind whatsoever, including all interest, penalties and additions imposed with respect to such amounts.

(xii)    The Seller owns free and clear of any liens or encumbrances all of the personal property reflected as owned by the Seller on its books, and all

other material items of personal property acquired by the Seller through the date hereof. All material items of such personal property used in the operation of the business of the Seller are in good operating condition, normal wear and tear excepted.

(xiii)  None of this Agreement, including any Schedule or Exhibit hereto, or any of the other Transaction Documents contains any untrue statement of material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to the Seller and that specifically relates to the Seller that has not been disclosed herein or in any other agreement, document or written statement furnished by the Seller to the Buyer or its counsel in connection with the transactions contemplated hereby that has or could reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or the assets, liabilities, properties, business, or prospects of the Company ("Material Adverse Effect").

(xiv)  Exhibit C attached hereto contains a true list of all shareholders of the Seller (the "Shareholders") and the number of shares owned by each Shareholder.

8.   Conditions to the Buyers' Obligations.

The Buyer's obligations to purchase the Shares at the Closing are subject to the satisfaction, at or before the Closing, of the following conditions, any of which may be waived by the Buyer:

(a)  **Representations and Warranties; Performance of Obligations**. The representations and warranties made by the Seller in Section 7 hereof shall be true and correct as of the Closing Date as if made on and as of such date (except (i) to the extent such representations and warranties speak as of a particular date, in which case they shall have been correct as of such date; the Seller shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it before or at the Closing.

(b)  **Legal Investment**. On the Closing Date, the sale and issuance of the Shares shall be legally permitted by all laws and regulations to which the Buyer and the Seller are subject.

(c)  No **Material Adverse Change**. Since the date of this Agreement, there shall have been no event, and no circumstance shall have arisen, with respect to the Seller that has had or that may reasonably be expected to have a Material Adverse Effect.

(d)  **Stockholder Agreement**. The Stockholder Agreement shall have been executed and delivered by the Seller, the Buyer, and each of the Shareholders.

9.   Miscellaneous

(a)     This Agreement with the attached exhibits constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supercedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically set forth herein. Except as otherwise provided by this Agreement, no supplement, modification or waiver or termination of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.  All the representations, warranties, covenants and agreements made by the Seller herein are material and shall survive any investigation made by the Buyer and the Closing of the transactions contemplated hereby.  All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Company pursuant hereto in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder as of the date of such certificate or instrument.

(b)     This Agreement may be executed in any number of counterpart copies, all of which shall constitute one and the same Agreement and each of which shall constitute an original, and shall become effective upon execution by and delivery to the Seller and Buyer.

(c)     Any request, notice or communication given pursuant hereto by one party to the other party hereto shall be in writing and delivered by hand or mailed by registered or certified mail, postage prepaid, addressed as follows:

If to Seller to:       Lev Goldfarb
                       6 Loring Hills Avenue, C-6
                       Salem, MA 01970

With a copy to:        David M. Stern, Esq.
                       Stern, Keilty & Wall, LLC
                       One Salem Green, Suite 550
                       Salem, MA 01970

If to Buyer to:        Eugene Peelikhov
                       14 Orlean Avenue
                       Salem, MA 01970

With a copy to:        Val Gurvits, Esq.
                       Boston Law Group, LLP
                       20 Park Plaza, Suite 637
                       Boston, MA 02116

or to such other address as hereafter shall be furnished as aforesaid by one party to the other party hereto.

(d)     This Agreement shall enure to the benefit of and shall be binding upon the heirs, executors, administrators and successors of the respective parties hereto.

(e)     This Agreement may not be assigned by either party hereto.

(f)     This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

(g)     Arbitration:  Any controversy or claim regarding this Purchase and Sale Agreement, its enforcement or interpretation, except for the non-compete provisions contained herein, shall be settled by final and binding arbitration administered by the American Arbitration Association ("AAA"), sitting in Boston, under its employment

Dispute Resolution Rules (one arbitrator), with the costs of the arbitrator and the AAA to be borne equally by the parties during the arbitration, and the award rendered by the arbitrator to include the prevailing party's legal fees and expenses (including costs of arbitration and reasonable attorney's fees) and to be enforceable and entered in any court of competent jurisdiction.

IN WITNESS WHEREOF, the individual parties hereto have hereunto set their hands and seals and have caused this Agreement to be executed under seal by their respective duly authorized officers all as of the day and year first above written.


_____
Eugene Pelikhov, Buyer


Lev Goldfarb, President
Gold and Farb, Inc., Seller


Lydmila Rogalin

## Exhibit C – Shareholders

| Name | Number of Shares |
|------|------------------|
| Lev Goldfarb | 500 |
| Alex Goldfarb | 250 |
| Lydmila Rogalin | 250 |

D:\CLIENTS\Goldfarb\Stock Transfer to Peelikhov\PURCHASE AND SALE AGREEMENT.doc

# Exhibit
# 2

## ASSIGNMENT OF STOCK CERTIFICATE

For value received I hereby sell, assign, and transfer 250 shares of the capital stock of
Gold and Farb, Inc. represented by the within certificate to Eugene Pelikhov and do
hereby constitute and appoint the said David M. Stern, Esquire as the attorney to cause
the said stock to be transferred on the books of the within-named company.

(Dated and signed in presence of witnesses.)

Date: January _18_, 2008

_Lydmila Rogalin_
Lydmila Rogalin

_Alanita J Callahan_
Witness

_____
Witness

# Exhibit
# 3



NUMBER

20

SHARES

250

**This Certifies that** Eugene Pelikhov _is the_

Registered Holder of ___two hundred fifty_____ _Shares of the_

Capital stock of GOLD AND FARB, INC.

_Transferable only on the books of the Corporation by the holder hereof in
person or by Attorney upon surrender of this Certificate properly endorsed.
In Witness Whereof, the said Corporation has caused this Certificate to be signed
by its duly authorized officers and its Corporate Seal to be hereunto affixed_

_this_ ___18TH___ _day_ _of_ ___January___ _A.D._ _2008_

_____        _____
President                                          Treasurer

© 2000, Goes Lithographing Co., Chicago, Inc.

# Exhibit
# 4

## CERTIFICATE OF VOTE

I, Lydmila Rogalin, Secretary of Gold and Farb, Inc., a corporation duly organized and existing under the laws of the Commonwealth of Massachusetts, do hereby certify that at a duly called and held meeting of the Board of Directors of said Corporation, at which a quorum was present and acting throughout, it was unanimously

VOTED:      To accept the resignation of Lydmila Rogalin as Secretary of the Corporation and as a Director of the Corporation.

VOTED:      To elect Alexander Goldfarb as Secretary of the Corporation.

VOTED:      To elect Eugene Pelikhov as Director of the Corporation

VOTED:      To acknowledge the transfer of two hundred fifty (250) shares of the corporation held by Lydmila Rogalin to Eugene Pelikhov.

VOTED:      To waive any restrictions on the transfer of the two hundred fifty (250) shares for this transaction only, and to allow Lydmila Rogalin to transfer to Eugene Pelikhov for good and valuable consideration received, two hundred fifty (250) shares of the Common Stock of the corporation.

I do hereby further certify that Lev Goldfarb is the President of this Corporation and that Alexander Goldfarb is the Treasurer of this Corporation, and duly elected, qualified and acting as such, that the foregoing votes are in full force and effect as of the date hereof, and that no provision of the charter or By-Laws of this Corporation prohibit, condition or detract from the authority hereinabove granted.

Date: _____          _Lydmila Rogalin_
                                         Lydmila Rogalin, Secretary

D:\CLIENT S\G-LFarb\Stock Transfer to Peelikhov\CERTIFICATE OF VOTE.doc

# Exhibit
# 5

## MINUTES OF THE SPECIAL MEETING OF DIRECTORS

### Of

### GOLD AND FARB, INC.

The special meeting of directors of the corporation was held in Salem on January 15th, 2008, at 9:00 AM.

The following directors were present: Lev Goldfarb, Lydmila Rogalin, and Alexander Goldfarb; being all the directors of the corporation and a quorum.

A waiver of notice of the meeting, was read by Lydmila Rogalin and subscribed by all the directors of the corporation, and it was ordered that it be appended to the minutes of the meeting.

The chairman then stated that the meeting was called for the purpose of

1.   Accepting resignation of Lydmila Rogalin as secretary of the corporation and director of the corporation;
2.   Election of Alexander Goldfarb as secretary of the corporation;
3.   Election of Eugene Pelikhov as director of the corporation;
4.   Acknowledging transfer of 250 shares of the corporation held by Lydmila Rogalin to Eugene Peelikhov; and
5.   Waiving any restrictions on the transfer of these two hundred fifty (250) shares for this transaction only, and to allow Lydmila Rogalin to transfer to Eugene Pelikhov for good and valuable consideration received, two hundred fifty (250) shares of the Common Stock of the corporation.


_Lev Goldfarb_
Lev Goldfarb, Director

_Lydmila Rogalin_
Lydmila Rogalin, Director

_Alex Goldfarb_
Alexander Goldfarb, Director

# Exhibit
# 6

**Gold and Farb, Inc.**

## STOCKHOLDERS' AGREEMENT

THIS STOCKHOLDERS' AGREEMENT is made as of January **18**, 2008, by and among

Gold and Farb, Inc., a Massachusetts corporation with its principal office at 145 Broad Street,

Lynn, Massachusetts (the "Corporation"), and the individuals listed on the attached Exhibit A

(such individuals sometimes hereinafter referred to individually as a "Stockholder" and

collectively as the "Stockholders").

WHEREAS, the Corporation is duly organized and validly existing under the laws of the

Commonwealth of Massachusetts with authorized capital stock consisting of 1,000 shares of

Common Stock, $0.01 par value per share (the "Common Stock"), of which 1,000 shares of

Common Stock, as of the date hereof, are issued and outstanding to the Stockholders (the

"Shares"), with each Stockholder owning that number of shares set forth opposite such

Stockholder's name on the attached Exhibit A;

WHEREAS, the Corporation is, and at various times in the future may be treated for

purposes of federal and state income taxes as an S Corporation (an "S Corporation"), in

accordance with Section 1361 et seq. of the Internal Revenue Code of 1986, as amended (the

"Code") and the Stockholders all agree and acknowledge that it is in the Corporation's best

interest and in the best interest of each of the Stockholders that the Corporation's election to be

taxed as an S Corporation (its "S Election") not be terminated other than at times and under

circumstances in which all of the Shareholders agree that it has become advisable to do so;

WHEREAS, the Stockholders understand the effects of making the S Election, and the

necessity of placing certain restrictions upon transfer of the Shares (as defined below) in order to

preserve the validity of the S Election;

1

WHEREAS, the Corporation and the Stockholders have determined that it is in their mutual best interests to provide for continuity of the S Election and in the management and policies of the Corporation, to restrict the ownership of Shares to individuals who can and are expected to contribute to the growth and success of the Corporation, to restrict the transferability of the Shares and to provide for their repurchase by or at the direction of the Corporation and the Stockholders in certain events; and

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements herein which are mutually and severally made by the parties hereto, it is hereby agreed as follows:

## ARTICLE 1 - DEFINITIONS

For all purposes of this Agreement and the Exhibits annexed hereto, the following definitions shall apply, unless the context otherwise requires:

(a) "Agreement" shall mean this Stockholders' Agreement and the Exhibits annexed hereto, as amended from time to time.

(b) "Disability" shall mean the mental or physical disability as determined by a majority of the Board of Directors on the basis of medical evidence that the Stockholder is unable, by reason of some mental or physical impairment, to fully, adequately and consistently with prior performance perform such Stockholder's duties as an employee or Director of the Corporation for a period of (i) 60 consecutive days or more or (ii) 120 days or more during any six month period. The Board's determination of a stockholder's disability will be binding on all parties. For

2

purposes of making such Board determination as to the disability of a Stockholder, such Stockholder shall not be entitled to vote as a Director.

(c) "Shares" shall mean any and all shares of the Common Stock now owned or hereafter acquired by a Stockholder, any capital stock of the Corporation issued after the date hereof with respect to or in replacement of such Common Stock and any capital stock, of any class, of the Corporation now or hereafter owned by any Stockholder.

(d) "Stockholders" shall mean the persons identified as Stockholders on Exhibit A of this Agreement and every person who shall subsequent to the date hereof join in and become a party to this Agreement by executing and delivering to the Corporation an Instrument of Adherence in the form of Exhibit B annexed hereto.

(e) "Termination for Cause" shall mean the termination of a Stockholder's employment with the Corporation arising from one or more of the following: (i) the Stockholder shall have committed an act of fraud, embezzlement, misappropriation or breach of fiduciary duty against the Company or any of its subsidiaries, including, but not limited to, the offer, payment, solicitation or acceptance of any unlawful bribe or kickback with respect to the business of the Company or any of its subsidiaries, as determined by a court of competent jurisdiction; or (ii) the Stockholder shall have been convicted by a court of competent jurisdiction of, or pleaded guilty or nolo contendere to, any felony (excluding any felony resulting from operating a motor vehicle); or (iii) the Stockholder shall have refused, after explicit written notice, to obey any lawful and reasonable resolution of or direction by the Board which is consistent with duties under his or her employment agreement; or (iv) the Stockholder shall have been chronically absent from work (excluding any vacations, any illnesses or physical or mental disability or any leaves of absence approved by the Company) and such absence shall have continued for a period

3

of 20 days after written notice to the Stockholder specifying such failure in reasonable detail; or

(v) the Stockholder shall have engaged in the unlawful use or possession of illegal drugs on the

Company's premises; or (vi) the Stockholder shall have breached any of the provisions of the

Confidentiality, Non-Solicitation or Non-Competition provisions Article 4 of this Agreement.

(f) "Transfer" shall mean, as to any of the Shares, to sell, transfer, assign, distribute, pledge,

hypothecate, encumber or otherwise dispose of, by gift or by will, or in any other way directly or

indirectly, either voluntarily or involuntarily, or to have taken any of the aforesaid actions, as the

context requires.

(g) "Transferor" shall mean the Stockholder offering his Shares, or who is deemed to have

offered his Shares, pursuant to Sections 2.3s of this Agreement.

## ARTICLE 2 - RESTRICTIONS ON TRANSFER OF SHARES

2.1 In General. This Agreement shall, during its term (which shall commence as of the date first

set forth above), apply to all Transfers of Shares, now owned or hereafter acquired by the

Stockholders, whether voluntary, involuntary or by operation of law, and whether resulting from

death, bankruptcy, insolvency or otherwise.

2.2 Restrictions on Transfer of Shares. No Stockholder shall, during the term of this Agreement,

Transfer any Shares, or any interest therein, to any person or entity except as otherwise

specifically provided for in this Agreement, and any Transfer of Shares not specifically permitted

by, or in violation of, this Agreement shall be void and of no effect.  Without limiting the

generality of the foregoing and despite the fact that neither the Corporation nor the other

Stockholders exercise their right of first refusal as provided herein, no Stockholder may transfer

all or any portion of his or her Shares to any person or entity, if such transfer will or may

reasonably be expected to result in a termination of the Corporation's S Election.  Any transfer

or other disposition of Shares in violation of the restrictions on transfer contained herein or resulting in termination of the Corporation's S Election in violation of the terms of this Agreement shall be null and void and shall not entitle the Stockholder or any proposed transferee or other person to have any Shares transferred upon the books of the Corporation. Such prohibited transfers include, but are not limited to, (a) the transfer of any Shares to a partnership, corporation, nonresident alien individual, estate (other than the estate of the Shareholder himself of herself) or trust (other than a trust that under the Code may hold S Corporation stock without terminating the S Election), and (b) the transfer of any Shares to more than one (1) person, when the increased number of Shareholders puts the total number of Stockholders of the Corporation to more than the maximum permissible number of stockholders of an S Corporation (presently one hundred (100)). Furthermore, no Stockholder will take any other action which would result in the termination of the S Election.

2.2.1 Waiver of Restrictions; Pledge of Shares as Collateral. The restrictions on transfer set forth herein may be waived by the unanimous vote of the Directors of this Corporation. The restrictions on transfer set forth herein shall not apply to any bona fide pledge of the Shares as collateral to secure a loan or financial commitment of the Corporation from a bank or other recognized financial institution, which loan is not for the purpose of circumventing the restrictions set forth herein; provided, however, the provisions hereof shall apply to any Transfer of such Shares by any such pledgee whether by foreclosure or otherwise.

2.2.2 Restrictions on the Corporation. The Corporation shall not engage in any transaction which shall terminate the Corporation's S Election. Without limiting the generality of the foregoing, so long as the taking of such actions will result in a termination of the Corporation's S Election the Company shall be prohibited from: (a) issuing a second class of stock of the

5

Corporation (other than nonvoting common stock) as determined pursuant to Section 1361 of the Code and the regulations thereunder; (b) issuing debt instruments, other than those which constitute straight debt as defined under Section 1361 of the Code and the regulations thereunder; (c) purchasing over eighty percent (80%) of the stock of another corporation; and (d) entering into the banking, thrift or insurance company business or from making tax elections which may terminate its S Election.

2.2.3 Representations; Consent to Election; Duration of Election. Each Stockholder hereby represents that such Stockholder is an eligible S Corporation shareholder (an "Eligible Shareholder") as defined by the Code. Each Stockholder hereby consents to the Corporation's S Election, and agrees to execute Internal Revenue Service Form 2553 or its successor if necessary, and such other or additional documents and consents as the Board of Directors of the Corporation in its discretion considers necessary or desirable to continue the S Election in effect.

The Corporation and the Stockholders agree that from and after the date hereof, (i) the Corporation shall maintain its status as a S Corporation until the Corporation and each Stockholder agree to terminate such status, and (ii) that if in the absence of such an agreement such a termination nevertheless occurs, then immediately upon its discovery the officers of the Corporation shall take action pursuant to Section 1362(f) of the Code to restore the status of the Corporation as an S Corporation. To effectuate the termination of the S Election pursuant to (i) above, the Company shall complete, execute and file with the Internal Revenue Service a revocation statement together with all other necessary documents, including any necessary statements of consent from Shareholders, and each Stockholder shall execute and deliver to the Corporation any statement of consent or other documents required under Subchapter S of Chapter 1 of the Code to be filed in connection with the termination of the S Election.

6

2.3 <u>Events Giving Rise to Purchase Options</u>. The Corporation and the Stockholders shall have the options to purchase Shares of a Transferor as provided in this Section 2.3. Options shall be exercised in accordance with the time periods set forth in Section 2.4, at the price set forth in Section 2.5 and upon the terms set forth in Section 2.6.

2.3.1 <u>Third Party Transfer</u>. If at any time a Stockholder desires to Transfer any or all of the Shares owned by such Stockholder pursuant to a bona fide written commitment from a third party who is not a Stockholder (the "Prospective Transferee"), the Transferor shall submit a written offer to sell all of such Shares to the Corporation and all Stockholders in accordance with the terms and conditions of this Article 2 (the "Third Party Transfer Offer"). The Third Party Transfer Offer shall disclose the identity of the Prospective Transferee, the number of Shares proposed to be transferred, the agreed terms of the Transfer and any other material facts relating to the Transfer.

As a condition precedent to the transfer of any Shares, the transferring Stockholder shall obtain from the Corporation a written certification that neither the contemplated transfer nor any contemplated transaction with respect thereto (including, without limitation, the foreclosure of any lien or encumbrance; or, in the case of a transfer in trust, the termination of the trust or the taking of any action by the beneficiary of the trust) will or might result in the termination of the S Election. The Corporation may require as a condition precedent to providing any such certification any or all of the following:

    (a)    an opinion of its counsel, satisfactory in form and substance to the Corporation, as to the matters to be contained in such certification; and

7

(b)        arrangements satisfactory to the Corporation to ensure that the transferee will

take all actions and execute all documents necessary to preserve the S Election

(including, without limitation, in the case of any transfer in trust the timely filing of an

election pursuant to Section 1361(d) of the Code).

2.3.7 Involuntary Transfers. The transfer of title to a Stockholder's Shares to an attaching or

judgment creditor, a purchaser at a judicial sale, a receiver or trustee in bankruptcy or assignee

for the benefit of creditors shall operate, without anything further, as an offer by the Stockholder

or such Stockholder's transferee to sell all of such Shares in accordance with the terms and

conditions of this Article 2 as of the date title is transferred (the "Involuntary Transfer Offer").

For purposes of this Agreement, the Third Party Transfer and the Involuntary Transfer Offer

shall sometimes be collectively or individually referred to as the "Offer."

2.4 Option Periods. The purchase options described in Section 2.3 shall be exercised as follows:

2.4.1 First Purchase Rights. (a) In the case of a Third Party Transfer Offer and Involuntary

Transfer Offer, the Corporation shall have the first right to purchase all but not less than all of

the Shares covered by the Offer (the "Offered Shares"). The Corporation shall act upon the Offer

within the      (30) days after actual receipt of the Offer, or, at the Corporation's option, actual

notice of the event giving rise to the Offer (the "Offering Period"). If the Corporation elects to

purchase all the Offered Shares, the Corporation shall give written notice to the Transferor and

all other Stockholders, before the end of the Offering Period, of its election to purchase, which

notice shall, when taken in conjunction with the Offer, be deemed to constitute a valid, legally

binding and enforceable agreement for the sale and purchase of the Offered Shares covered

thereby. The closing of such purchase and sale shall take place at the offices of the Corporation

8

at a mutually agreeable time and date, but during business hours and in all events within fifteen

(15) days after receipt of the Corporation's election to purchase (the "Closing Period").

2.4.2 Second Purchase Rights. If the Corporation elects not to purchase all of the Offered Shares

within the Offering Period, or fails to purchase all of the Offered Shares within the Closing

Period, the Stockholders shall have the right to purchase all but not less than all of the Offered

Shares, pro rata, in proportion to their respective ownership of the Common Stock of the

Corporation as of the date of the Offer. The right to purchase the remaining Offered Shares may

be exercised by giving written notice to the Transferor, the other Stockholders and the

Corporation within fifteen (15) days after the expiration of the Offering Period or, in the event

the Corporation fails to purchase the Offered Shares which it elected to purchase, within fifteen

(15) days after the receipt of notice from the Transferor that the Corporation failed to purchase

the Offered Shares (the "Stockholder Offering Period"). If any Stockholder elects not to purchase

such Stockholder's pro rata amount of the remaining Offered Shares, the remaining Stockholders

shall then have the right to purchase all, but not less than all, said remaining Offered Shares pro

rata and shall give the Transferor and the other Stockholders notice of their election to purchase

no later than five (5) days after the expiration of the Stockholder Offering Period. If the other

Stockholders shall collectively elect to purchase all of the remaining Offered Shares, the notices

of exercise shall, when taken in conjunction with the Offer, be deemed to constitute a valid,

legally binding and enforceable agreement for the sale and purchase of the Offered Shares

covered thereby. The closing of such purchase and sale shall take place at the offices of the

Corporation at a mutually agreeable time, but in all events within fifteen (15) days after receipt

of the final Stockholder election to purchase (the "Stockholder Closing Period").

2.4.3 Sale to Prospective Transferee. If, in the case of a Third Party Transfer Offer, the Corporation or the Stockholders do not purchase the Offered Shares, the Offered Shares may be sold by the Transferor to the Prospective Transferee at any time within sixty (60) days after the expiration of the five-day option period described in Section 2.4.2. Any such sale shall be at not less than the price specified in the Offer and upon other terms and conditions, if any, not more favorable to the Prospective Transferee than those specified in the Offer. If the Transferor does not so sell the Offered Shares within such 60-day period, the Offered Shares shall thereafter again be subject to all of the restrictions and provisions of this Article 2.

2.4.5 Stock to Remain Subject to this Agreement. If an option to purchase Shares under any Section of this Article 2 is not timely exercised or closed, then the Shares not purchased shall remain subject to all of the restrictions and provisions of this Agreement.

2.4.6 Corporation's Right to Assign Purchase Rights and Obligations. In all circumstances under this Article 2, the Corporation may assign its right or obligation to purchase Shares, as the case may be, to one or more assignees, including the non-Transferor Stockholders.

2.5 Purchase Price. Notwithstanding anything to the contrary contained in this Agreement, in the case of an Involuntary Offer, the purchase price of the Shares shall be the Fair Value of the Shares, as defined in this Agreement.

2.6 Purchase Terms. (a) At the Closing of a purchase option exercised under Section 2.4, the Transferor shall deliver to the Corporation and the Stockholders, as the case may be, stock certificates evidencing the Offered Shares to be transferred, which shares shall be validly issued, fully paid and nonassessable and shall not be subject to any liens, encumbrances, restrictions on transfer or rights of others, accompanied by executed stock assignments.

10

(b) At the Closing of a purchase option exercised pursuant to a **Third Party Transfer Offer** or an **Involuntary Termination Offer,** the Corporation or the Stockholders, as the case may be, purchasing the Offered Shares shall pay for such Shares by delivering to the Transferor one or more bank checks or money orders in an amount equal to the entire purchase price.

2.7 Fair Value of Shares. For purposes of this Agreement, the fair value (the "Fair Value") per share of the Shares shall be equal to an amount determined by the Company's certified public accountants (the "Company Accountants") and initially agreed to by all of the Stockholders and set forth in a certificate signed by all of the Stockholders, substantially in the form of Exhibit D annexed hereto (the "Certificate of Value"). The Certificate of Value shall be completed and executed by the Stockholders immediately upon execution of this Agreement. Within twelve months of the date hereof and every twelve months thereafter, or more frequently as they may determine, the Company Accountants shall restate the Fair Value per share of the Shares, which restated Fair Value shall be set forth in a new Certificate of Value. Notwithstanding the foregoing, the Fair Value of the Shares shall be subject to change as follows:

(i) If the most recent Certificate of Value is dated twelve (12) months or less prior to the date of the event triggering the option to purchase hereunder (the "Triggering Event"), the Fair Value per share shall be the Fair Value as set forth in that most recent Certificate of Value.

(ii) If the most recent Certificate of Value is dated more than twelve (12) months but eighteen (18) months or less prior to the date of the Triggering Event, the Fair Value per share shall be adjusted to reflect any increase or decrease in value of the Corporation, on a per share basis, as determined by the Company Accountants using the same criteria that was used to determine the Fair Value at the time the most recent Certificate of Value was executed.

11

(iii) If the most recent Certificate of Value is dated more than eighteen (18) months prior to the Triggering Event, then the Fair Value per share shall be determined by agreement of the parties. If the parties cannot agree on the Fair Value of the Shares, that value shall be determined by appraisal. The Transferor and the Corporation or the Stockholders wishing to purchase the Offered Shares, as the case may be, shall each engage an appraiser. Fair Value shall be the amount agreed upon by both appraisers. In the event of a disagreement between the two appraisers, if the lower appraisal is ninety percent (90%) or more of the higher appraisal, then fifty percent (50%) of the difference shall be added to the lower appraisal and that total shall be the Fair Value. If the lower appraisal is less than ninety percent (90%) of the higher appraisal, the Transferor and the Corporation or the other Stockholders, as the case may be, shall seek binding arbitration before the American Arbitration Association in Boston, Massachusetts in accordance with the Commercial Arbitration Rules of that Association. The arbitrator(s), who shall have direct experience in business valuations, shall consider such evidence as they may consider relevant to the valuation of the Shares and shall within forty-five (45) days of their selection deliver in a writing to the Transferor and the Corporation or the other Stockholders, as the case may be, their findings with respect to the Fair Value of the Shares as of the date of the Triggering Event. All costs of the arbitration, other than the fees for the appraisers engaged by each party, shall be borne equally between the Transferor, as seller, and the Corporation or the other Stockholders, as the case may be, as buyer(s).

2.8 Conditions Prior To Voluntary Transfer. As conditions precedent to the Transfer of any Shares to a Prospective Transferee who is not already a Stockholder, the Transferor shall become a party to, and be bound by the provisions of, this Agreement by executing and delivering to the Corporation and all the Stockholders an Instrument of Adherence in the form of the attached

12

Exhibit B. Said Instrument of Adherence shall become a part of this Agreement, and the Shares transferred to the Transferee shall remain subject to all the terms of this Agreement. Upon such Transfer of Shares, all references herein to a Stockholder or the Stockholders shall thereafter be deemed to include such Transferee. Notwithstanding any failure by a Transferee to execute the Instrument of Adherence, the Transferee shall be subject to the provisions of this Agreement and the Shares transferred to the Transferee shall continue to be restricted by this Agreement.

2.9 Cooperation of Corporation. The Corporation, for itself and its successors and assigns, hereby consents to this Agreement and agrees not to Transfer any Shares of its Common Stock in violation of the provisions of this Agreement.

2.10 Specific Performance. No Stockholder shall have the right or power to sell or assign any Shares except in strict compliance with the terms and conditions set forth in this Agreement. The parties hereto agree that the Shares are unique, that failure to perform the obligations provided by this Agreement shall result in irreparable damage, and that specific performance of these obligations may be obtained by suit in equity.

2.11 Corporation's Purchase Controlled by Law. Notwithstanding any other provision of this Agreement, it is understood and agreed that the Company shall not be required to purchase any Shares except to the extent that the Company is authorized and permitted to do so pursuant to the laws of the Commonwealth of Massachusetts. With respect to purchases by the Company, the Stockholders agree to take any and all legally permissible steps as may be appropriate in order for the Company to purchase the Shares in accordance with this Agreement. Stockholders agree to take all steps necessary to vote their respective shares of stock and take such other steps as may be appropriate and necessary and to cooperate in all corporate actions that may be required in order for Corporation lawfully to purchase and pay for shares. Corporation agrees to take the

13

steps that may be appropriate and necessary in order for Corporation to lawfully purchase and
pay for shares.

2.12 Claw Back Rights. If all or part of a deceased Stockholder's Shares are purchased pursuant
to the provisions of this Agreement, and, within 365 days after the death of the Stockholder, all
or substantially all of the assets, or more than fifty percent (50%) of the outstanding stock, of the
Corporation is sold in one or more related transactions, or if the Corporation is merged,
consolidated or liquidated, the deceased Stockholder (or his estate) shall be entitled to receive a
portion of the proceeds of any such sale, merger, consolidation or liquidation equal to (i) the
product of (A) the Purchase Price Per Share (as defined below) multiplied by (B) the number of
Shares acquired from the deceased Stockholder (or his estate) (the "Acquired Shares"), less (ii)
the amounts previously paid for the Acquired Shares. If the preceding computation results in a
number equal to or less than zero, the deceased Stockholder, and his estate, shall not be required
to pay any portion of the proceeds of such sale, merger, consolidation or liquidation. "Purchase
Price Per Share" means the quotient of (x) the net proceeds of any such sale, merger,
consolidation or liquidation received by the other Stockholder (or the Corporation in the case of
a sale of all or substantially all of its assets), divided by (y) the total number of shares of stock of
the Corporation outstanding immediately before the death of the Stockholder, including the
shares, if any, owned by stockholders of the Corporation not party to this Agreement. In the case
of a sale of all or substantially all of the assets of the Corporation, the payment due the deceased
or disabled Stockholder (or his estate) under this Section 2.5(b) shall be made by the
Corporation. In the case of a sale of more than fifty percent (50%) of the outstanding stock of the
Corporation or of a merger, consolidation or liquidation, the payment shall be made by the other
Stockholders.

14

## ARTICLE 3 - STOCKHOLDER AND DIRECTOR ACTIONS

3.1 Stockholder Election of Directors. Each Stockholder covenants and agrees that at each annual meeting of the stockholders of the Corporation, and at each special meeting of the stockholders of the Corporation called for the purpose of electing directors of the Corporation, and at any time at which stockholders of the Corporation shall have the right to, or shall, vote for directors of the Corporation, then and in each event, such Stockholder shall vote all of such Stockholder's Shares entitled to vote thereon for a Board of Directors comprising not less than three (3) members, including Lev Goldfarb, Alexander Goldfarb, and Eugene Pelikhov, (or their designee) as long as each of them is a stockholder owning not less than 10% of the voting shares of the Corporation. If any Stockholder sells Stockholder's Shares such that Stockholder owns less than 10% of the voting shares of the Corporation, such Stockholder shall no longer be entitled to be (or to nominate) a Director and such position as Director shall be filled or eliminated as determined by vote of a majority in interest by percentage of the remaining Stockholders. Upon a vacancy on the Board of Directors, each Stockholder covenants and agrees to vote all of such Stockholder's Shares in accordance with the procedure described in this Article 3 in order to fill such vacancy.

3.2 Director Election of Officers. Each Stockholder covenants and agrees that at each annual meeting of the Directors of the Corporation, and at each special meeting of the Directors of the Corporation called for the purpose, among other things, of electing officers of the Corporation, and at any time at which Directors of the Corporation shall have the right to, or shall, vote for officers of the Corporation, then and in each event, each such Stockholder shall vote Lev Goldfarb as President and Alexander Godlfarb as Secretary of the Corporation and Treasurer of the Corporation.

15

3.3 <u>Distributions to Stockholder</u>. One effect of an S Election is that all of the Corporation's net profits are taxed directly to the Stockholders, even if such net profits are not distributed. Because such taxation of the Corporation's net profits could, without any corresponding distribution of such net profits, cause a hardship on some Stockholders, the Corporation agrees that for each of its taxable years while the S Election is in effect and during which such Stockholder owns Shares of stock of the Corporation (and not merely options to acquire Shares), it will distribute to each Stockholder, for each Share owned by the Stockholder, cash in an amount at least equal to each Share's pro rata portion of the product of (a) the amount of the Corporation's net profit, net long-term capital gains and net gains from the sale or exchange of assets the gains from which are taxable under Section 1231 of the Code and which are taxable to the Stockholder and (b) the highest cumulative maximum applicable statutory rate of federal and Massachusetts state income tax payable by any Stockholder (that is, the sum of the maximum rates of federal and Massachusetts state income tax, adjusted to take into account the deductibility of Massachusetts state income tax for purposes of determining federal income tax); provided, however, that (i) such distributions shall be conditioned on the determination by the Corporation, in its sole discretion, that funds are legally available for distribution and that making such distribution would not subject the Corporation or any of its officers or directors to liability to any person, (ii) the Corporation, in its sole discretion, shall determine the amount of cash , if any, to be distributed to each Stockholder and (iii) such tax distributions shall not be made if they shall cause the Corporation to be deemed to have more than one class of stock under Section 1361 of the Code and the regulations thereunder. Regardless of any distributions made to the Stockholders pursuant to this Section 3.3, the Corporation's outstanding shares of stock shall confer identical rights to distribution and liquidation proceeds to its Stockholders and

16

the Corporation shall make such distributions and any other distributions in a manner such that all shares of stock have such identical rights. Distributions of the amount described in the preceding sentence shall be made on or before each date on which estimated income tax payments are due and payable by the Stockholders and the aggregate amount distributed by the Corporation on the occasion of each such distribution may be equal or unequal in size; provided however, that the amount distributed by the Corporation with respect to each share of stock shall at all times be equivalent on a per share basis. Nothing in this Section 3.3 shall be construed to prevent the Corporation from making distributions to any Stockholder more frequently than, or in larger amounts than, the minimum distributions herein described.

## ARTICLE 4 - CONFIDENTIALITY
## NON-COMPETITION AND NON-SOLICITATION

4.1 Confidential Information. For so long as a Stockholder owns Shares and at all times thereafter, such Stockholder agrees not to disclose any confidential or proprietary information of the Corporation or its customers, including without limitation, customer lists, customer contracts, prospective customer lists, business plans, marketing plans, financial statements and financial projections, and agrees to hold such information strictly confidential, except to the extent such information is (i) generally known and used by persons with training and experience comparable to such Stockholder, (ii) common knowledge in the Corporation's industry, or (iii) otherwise in the public domain by virtue of other than a breach of this confidentiality provision or any similar confidentiality provision between the Corporation and another person. Upon Termination of a Stockholder's employment, consulting arrangement or directorship with the Corporation or purchase of all of Stockholder's Shares, each Stockholder will return to the Corporation all

17

documents and materials containing any such information which were prepared or received in connection with such Stockholder's employment, consulting arrangement or directorship or otherwise, and which are in such Stockholder's possession, custody or control including, without limitation, all software, computer printouts, computer disks and tapes, files, customer lists, rolodex cards, diagrams, brochures, books, articles, papers and records of every kind and description.

4.2 Non-Competition. Each Stockholder covenants and agrees that so long as such person is a Stockholder, employee, consultant or director of the Corporation, and for a period of two (2) year thereafter, such Stockholder will not directly or indirectly, whether as an officer, director, stockholder, partner, proprietor, associate, representative, consultant or otherwise, become or be employed or retained by or financially interested in, any other person, corporation, firm, partnership or other entity whatsoever engaged in any business in competition with the Corporation's business. The geographic limitation shall be Essex County, Massachusetts.

4.3 Non-Solicitation. Each Stockholder covenants and agrees that during the term of such Stockholder's employment, consulting arrangement or directorship with the Corporation, and for a period of two (2) year thereafter, such Stockholder shall not, for such Stockholder's own benefit or for the benefit of any person or entity other than the Corporation, solicit any employee of the Corporation or any affiliate of the Corporation to leave his or her employment.

4.4 Corporate Opportunities. Each Stockholder covenants and agrees that so long as such person is a stockholder of the Corporation, unless and until the Corporation rejects an opportunity, by at least a majority vote of its Board of Directors, each Stockholder agrees to present to the Corporation, and not to divert for personal gain, any opportunity known to such Stockholder which may be of interest to the Corporation when (and only when) such opportunity is closely

18

associated with and related to the Corporation's present business of operating a grocery store directed and the Russian community in Essex County, including, without limitation, any opportunity growing out of a pre-existing relationship with the Corporation and any other opportunities which in equity or fairness belong to the Corporation.

4.5 Injunction. Each Stockholder agrees that a violation of the Stockholder's covenants in this Article 4 will cause such harm to the Corporation as will be irreparable, which harm cannot be adequately remedied solely by an action at law for money damages, and for that reason the Corporation shall be entitled as a matter of right to an injunction from any court of competent jurisdiction restraining any further violation. Such right to an injunction or restraining order shall not limit the availability of any other rights or remedies available to the Corporation. In the event of a judicial proceeding to enjoin a violation of a Stockholder's covenants, the term of the violated covenant shall be extended by the duration of the violation as determined in that proceeding.

## ARTICLE 5 - MISCELLANEOUS

5.1 Change in Shares. If there shall be any change in the Shares through merger, consolidation, reorganization, recapitalization, stock dividend, split-up, combination or exchange of shares, or the like, all of the terms and provisions of this Agreement shall apply to any new, additional or different shares or securities issued as a result of such event, and the Fair Value and the number of shares or other securities that may be purchased under this Agreement shall be appropriately adjusted by the Board of Directors.

5.2 Legend on Each Certificate. For as long as this Agreement is in effect, each stock certificate representing the Shares shall bear a legend as follows:

The shares of stock represented by this certificate are subject to rights of repurchase and restrictions on transfer and other provisions set forth in a Stockholders' Agreement dated as of January 18, 2008, as the same may be amended or restated from time to time, a copy of which will be furnished to any holder of this certificate by the Corporation upon written request and without charge therefor.

5.3 <u>Term of Agreement</u>. This Agreement shall commence as of the date hereof and shall terminate upon the earliest to occur of (a) the bankruptcy, receivership or dissolution of the Corporation; or (b) the beneficial ownership of all of the Shares by one Stockholder. Notwithstanding anything to the contrary contained herein, the termination of this Agreement pursuant to this Section 5.3 or otherwise shall not affect any rights or obligations of any party hereto which have arisen and vested prior to such termination including without limitation, such rights and obligations under Articles 2 and 4 hereof.

5.4 <u>Notices</u>. Except as otherwise provided herein, any offer, acceptance, election, notice or other communication required or permitted to be given pursuant to this Agreement shall be deemed to have been duly and sufficiently given for all purposes if in writing and (a) delivered personally to the party or to an officer, trustee or other representative of the party to whom such notice shall be directed or (b) sent by certified mail, postage prepaid, return receipt requested, if to the Corporation, at its principal place of business, or if to any of the Stockholders, at such Stockholder's home address or regular business address set forth in <u>Exhibit A</u>, or to such other address, including email address, as such party may designate to each of the other parties hereto by a notice complying with the requirements of this Section 5.4. Any such notice shall be deemed to have been given on the date of hand delivery or the date two (2) days after the date of mailing as aforesaid.

20

5.5 Further Action. The Stockholders and their Legal Representatives, if any, shall take such actions, individually and as officers, directors and stockholders, as the case may be, as may be necessary for the purpose of consummating any purchases and sales required or permitted pursuant to this Agreement and for effecting the terms hereof including, without limitation, obtaining any court authority or license required to effect any Transfer of the Shares of a Stockholder upon such Stockholder's death, Termination or Disability.

5.6 Entire Agreement; Amendments. This Agreement contains the entire agreement among the parties hereto with respect to the matters contemplated hereby, and no prior agreement, whether written or oral, shall be construed to modify or repeal this Agreement. This Agreement may be amended only by a written instrument executed in one or more counterparts by the Corporation and the holders of at least two-thirds of the Shares; provided, however, that any such amendment to this Agreement shall not affect the rights or obligations of any former Stockholder unless such former Stockholder has agreed or consented thereto in writing.

5.7 Equitable Remedies. Each Stockholder acknowledges that a remedy at law for any breach or threatened breach by such Stockholder of the provisions of this Agreement may be inadequate and that the Corporation (or any other Stockholder) shall be entitled to injunctive relief in the case of any such breach or threatened breach. Furthermore, each Stockholder hereby agrees that the Corporation (or any other Stockholder) shall have the right to set off and deduct against any amounts due hereunder by the Corporation (or any other Stockholder) to such Stockholder pursuant to Article 2 hereof the amount of any losses or damages actually suffered by the Corporation (or any other Stockholder) arising from any breach.

5.8 Jurisdiction; Arbitration; Costs. The Stockholders consent to the exclusive jurisdiction of any state or federal court of competent jurisdiction in the Commonwealth of Massachusetts in any

action, suit, or proceeding of any kind which arises out of or by reason of this Agreement;
provided, however, should any dispute arise between the parties hereto concerning this
Agreement, other than a dispute for which injunctive relief is the appropriate remedy as provided
in Sections 2.10, 4.5 and 5.7 of this Agreement, which disputes cannot be settled by the parties,
that dispute shall be settled by binding arbitration before the American Arbitration Association in
Boston, Massachusetts in accordance with the Commercial Arbitration Rules of that Association.
The written decision of the arbitrator(s) shall be conclusive and binding upon the parties and in
such form that judgment may be entered in and enforced by any court having jurisdiction over
the parties. The losing party shall pay the costs of any arbitration, including prompt
reimbursement to the prevailing party of reasonable attorneys' fees incurred in connection with
the arbitration. The arbitrators shall specify the prevailing and losing party, if any, in the
arbitration award. If more than one arbitrable dispute is arbitrated, then the costs and expenses of
the arbitration shall be apportioned by the arbitrators in the arbitration award to each separate
dispute.

5.9 Agreement to Employ. Except as specifically set forth herein, nothing contained in this
Agreement shall be construed to constitute or be evidence of any agreement or understanding,
express or implied, on the part of the Corporation to employ or retain any Stockholder for any
specific period of time or to limit the Corporation's ability to terminate the employment,
consulting arrangement or directorship of any Stockholder at any time, for any reason or no
reason. Notwithstanding the foregoing, the Corporation agrees to employ Eugene Pelikhov in
the following capacity as long as Mr. Pelikhov is a shareholder. Mr. Pelikhov's base salary shall
be $500.00 per week drawn from the Corporation's payroll account. Mr. Pelikhov shall also
receive an additional $500.00 per week drawn from the Corporation's operating account. The

22

Corporation can terminate Mr. Pelikhov only pursuant to his Termination For Cause, Disability, death or for material failure of the Stockholder to perform the usual daily job of operating the grocery store by failure to contribute a full-time effort of labor and time as currently performed by the Stockholder.

5.10 Binding Effect. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, legal representatives, successors and assigns.

5.11 Waiver. No waiver hereunder shall be effective unless it is set forth in a written instrument executed by the party waiving a breach or default hereunder. No consent to or waiver of any breach or default in the performance of any obligation hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance of the same or any other obligation hereunder. Failure on the part of any party to complain of any act or failure to act of any other party or to declare any other party in default of any obligation hereunder, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

5.12 Severability. If any provision of this Agreement shall, in whole or in part, prove to be invalid for any reason, such invalidity shall affect only the portion of such provision which shall be invalid and in all other respects this Agreement shall be effective as if such invalid provision, or the invalid portion thereof, had not been a part hereof. Without limiting the generality of the foregoing, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

5.13 Headings. The headings of sections and subsections of this Agreement have been inserted for convenience of reference only and shall not be deemed to affect the meaning of any of the provisions of this Agreement.

5.14 Governing Law. This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard for choice of law provisions.

5.15 Counterparts. This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.


IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as an instrument under seal as of the date first set forth above.

STOCKHOLDERS: Gold and Farb, Inc.

_Lev Goldfarb_          By: _Lev Goldfarb_

Lev Goldfarb                       Lev Goldfarb, President

_Alex Goldfarb_

Alexander Goldfarb

Eugene Pelikhov

Exhibit A

**GOLD AND FARB, INC.**

List of Stockholders

<u>as of January __, 2008</u>

| <u>Stockholder and Address</u> | <u>Number of Shares</u> |
|---|---|
| Lev Goldfarb<br>6 Loring Hills Avenue, C-6<br>Salem, MA 01970 | 500 |
| Alexander Goldfarb<br>6 Loring Hills Avenue, C-6<br>Salem, MA 01970 | 250 |
| Eugene Felikhov<br>14 Orleans Avenue<br>Salem, MA 01970 | 250 |

Exhibit B

**GOLD AND FARB, INC.**

Instrument of Adherence

The undersigned, as a condition to becoming the owner or holder of shares of Common Stock, $0.01 par value per share, of Gold and Farb, Inc., a Massachusetts corporation (the "Corporation"), hereby agrees to become a party to that certain Stockholders' Agreement dated as of January 18, 2008, by and among the Corporation and its Stockholders (the "Stockholders' Agreement"), and to be deemed a "Stockholder" for the purposes of, and within the meaning contained in, the Stockholders' Agreement. The undersigned further agrees to be bound by all of the provisions of the Stockholders' Agreement. This Instrument of Adherence shall take effect and shall become a part of said Stockholders' Agreement immediately upon the execution by the undersigned.

Executed as a sealed instrument under the laws of the Commonwealth of Massachusetts.

Signature: _____

Name: _____

Address: _____

_____

Date: _____

Acknowledged and accepted:

GOLD AND FARB, INC.

By: _Lev Goldfarb_

Authorized Officer

Date: _____

26

Exhibit D

**GOLD AND FARB, INC.**

Certificate of Fair Value

Pursuant to Section 2.6 of that certain Stockholders' Agreement dated as of January _18_ 2008

by and among Gold and Farb, Inc. (the "Corporation"), and some or all of the stockholders of the

Corporation, the undersigned, being all of the Stockholders under that Stockholders' Agreement,

hereby severally and collectively agree that the fair value of the Common Stock, $0.01 par value

per share, of the Corporation is:

$ 700.00 per share.

Executed as of the _18_ day of January, 2008.

STOCKHOLDERS:

Lev Goldfarb

Alexander Goldfarb

Eugene Pelikhov

27

Exhibit D

**GOLD AND FARB, INC.**

Certificate of Fair Value

Pursuant to Section 2.6 of that certain Stockholders' Agreement dated as of January _18_, 2008 by and among Gold and Farb, Inc. (the "Corporation"), and some or all of the stockholders of the Corporation, the undersigned, being all of the Stockholders under that Stockholders' Agreement, hereby severally and collectively agree that the fair value of the Common Stock, $0.01 par value per share, of the Corporation is:

$ 700.00 per share.

Executed as of the _18_ day of January, 2008.

STOCKHOLDERS:

_Lev Goldfarb_ (signature)

Lev Goldfarb

_____

Alexander Goldfarb

_____ (signature)

Eugene Pelikhov

27

28

# Exhibit
# 7

# BOSTON LAW GROUP, PC

### ATTORNEYS AT LAW

825 BEACON STREET, SUITE 20
NEWTON CENTRE, MASSACHUSETTS 02459

Main (617) 928-1800                                                        Fax (617) 928-1802

## NOTICE OF FRAUD, EMBEZZLEMENT
## BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY

**Via Federal Express**

July 17, 2014

Mr. Lev Goldfarb, President
Gold and Farb, Inc.
145-147 Broad Street
Lynn, MA 01902

Dear Mr. Goldfarb:

Please be advised that this firm represents Mr. Eugene Pelikhov in connection with his interest in and employment with Gold and Farb, Inc. (the "Corporation"). Please forward all future communication regarding this matter to my attention.

You are hereby put on notice of my client's intent to file suit against you, Mr. Alex Goldfarb, Ms. Lydmila Rogalin and the Corporation for fraud, embezzlement, breach of contract and breach of fiduciary duty, unless his claims are immediately resolved.

Mr. Pelikov's claims arise out of (but are not limited to) the following facts:

Pursuant to that certain Purchase and Sale Agreement between Mr. Peelikhov (as Buyer) and Gold and Farb, Inc., and Lydmila Rogalin (as Sellers) dated January 18. 2008 (the "P&S Agreement"). Mr. Pelikhov acquired twenty five percent (25%) of all issued and outstanding shares of the Corporation.

In conjunction with the P&S Agreement, Mr. Pelikhov, you, Alex Goldfarb and the Corporation entered into a Stockholders' Agreement, also dated January 18. 2008. pursuant to which the Corporation would be governed. Pursuant to the P&S Agreementm. the Stockholders' Agreement, and his statutory rights, Mr. Pelikhov was entitled to certain rights, including: (1) Full-time employment with the Corporation; (2) a seat on the Board of Directors of the Corporation to manage the Corporation; (3) 25% of the profits of the Corporation; and (4) full access to the corporate and accounting records of the Corporation.

Despite your and Mr. Alex Goldfarb's duties to Mr. Pelikhov pursuant to the written agreements, statutes and your fiduciary duties as shareholders, officers and directors of the Corporation, you have frozen Mr. Pelikhov out of the Corporation, created a hostile workplace, engaged in embezzlement and conducted extensive fraudulent accounting practices so as to

1

evade taxes and withhold profits from Mr. Pelikhov. Specifically, and without limitation, you have engaged in the following acts and omissions in contravention of your duties:

1. You have consistently denied Mr. Pelikhov access to the corporation and accounting records of the Corporation.
2. You have consistently failed to consult with Mr. Pelikhov as a member of the Board of Directors of the Corporation in making decisions requiring a vote of the Board of Directors.
3. You have created a hostile work environment for Mr. Pelikhov by verbally abusing and berating him on an ongoing basis. This situation has gotten so serious that Mr. Pelikhov has been unable to continue working for the Corporation, causing emotional distress, mental anguish and other personal injury. Your actions in this regard constitute constructive termination of Mr. Pelikhov's employment.
4. You have failed to properly account for and report cash sales of the Corporation, and have misappropriated the profits of the Corporation without properly accounting for them to Mr. Pelikhov or the proper tax authorities. As a result of these acts and omissions, you have fraudulently withheld at least $125,000 of the Corporations profits from Mr. Pelikhov.
5. You have underreported cash sales, thereby opening the Corporation to potential liability to tax authorities.

Your actions and omissions are a breach of your contractual duties under the P&S Agreement and the Stockholders' Agreement and a breach of your duties to Mr. Pelikhov as a director and shareholder of the corporation, a closely held company. See *Donahue v. Rodd Electrotype Co.*, 328 N.E.2d 505 (Mass. 1975) (holding that heightened fiduciary duties apply to all shareholders of a closely-held corporation); *Brodie v. Jordan*, 857 N.E.2d 1076 (Mass. 2006) (holding that majority shareholder is prohibited from freezing out the minority by frustrating the minority's reasonable expectation of benefit from their ownership of shares).

As a result of your fraud, embezzlement, breach of contract and breach of duty, my client suffered and continues to suffer staggering financing damages which are growing daily. Therefore, in light of the damages you have caused my client, only part of which is readily calculable at this time, in partial remedy for such damages, **Mr. Pelikhov hereby demands that you immediately pay him $300,000.** This amount represents the amount of Mr. Pelikov's initial $175,000 purchase of the shares in the Corporation and a reasonable calculation of the minimum amount of profits that you have withheld from Mr. Pelikhov since 2008.

In addition, in light of the foregoing described fraudulent accounting practices hiding the Mr. Pelikhov's true and complete damages, Mr. Pelikhov demands access to, and the opportunity to make copies of, certain organizational and financial information concerning the Corporation. The specific information demanded is as follows:

1. All monthly and annual statements received from banks, mutual funds or other financial institutions holding assets of the Corporation.

2.   All monthly and annual financial statements of the Corporation, including income statements, balance sheets and cash flow statements.
3.   All transaction (general ledger) records.
4.   All check transaction logs.

The above-listed information must cover the period from January 1, 2008 through the present.

Mr. Pelikhov demands the examination of the above-described information so as to ascertain the financial position of the Corporation and to determine the complete amounts due to him. Upon review of the above-detailed information, Mr. Pelikhov may demand additional information of the Corporation and additional monetary damages. We are taking the formal step of requesting the above information on Mr. Pelikhov's behalf because his previous efforts to gain access to certain portions of the information have been rebuffed by you and Mr. Alex Goldfarb. Mr. Pelikhov is entitled to receive all of the requested information by virtue of his being a shareholder and director of the Corporation. *See, e.g.*, M.G.L. Ch. 156D Sec. 16.02.

Please be advised that in the event that you fail to comply with Mr. Pelikhov's demands, Mr. Pelikhov shall take legal action pursuant to the P&S Agreement, the Stockholders' Agreement and M.G.L. Ch. 156D Sec. 16.04, which allow Mr. Pelikhov to collect the legal costs and expenses (including reasonable attorneys' fees) incurred in the action. Attached hereto is a draft copy of a Complaint that Mr. Pelikhov will file against you, Mr. Alex Goldfarb, Ms. Lyudmila Rogalin and the Corporation should you not comply with Mr. Pelikhov's demands.

Please immediately inform me of when you will make the above-described information available for examination by Mr. Pelikhov, one or more representatives of my firm and Mr. Pelikhov's independent accountant. We expect that the necessary arrangements will be made within the next ten (10) business days. We are available to view the information at the Corporation's officer or at another location in the Boston area.

Finally, it should go without saying that you, nor any of your affiliates or associates, should take any steps to discard, delete or destroy any of the requested information, or any other information material to the business of the Corporation, whether written or printed, or housed in computers or other digital media, or otherwise maintained.

This letter is not intended to constitute, nor shall it be deemed to constitute, a full statement of all facts, rights or claims relating to this matter, nor is it intended, nor shall it be construed as a waiver, release or relinquishment of any defenses, rights or remedies available to my client, whether legal or equitable, all of which are hereby expressly reserved.

Very Truly Yours,

Val Gurvits, Esq.

3

# Exhibit
# 8

# VLADIMIR VON TIMROTH, ESQ.

ATTORNEY AT LAW
405 Grove Street, Suite 204
Worcester, MA 01605

Telephone (508) 753 2006                                    Facsimile (774) 221 9146

July 22, 2014

Via facsimile (617) 928-1802
and Certified Mail

Eugene Pelikov
c/o Val Gurvits, Esq.
Boston Law Group, P.C.
825 Beacon Street, Suite 20
Newton Center, MA 02459

      Re:    Gold and Farb, Inc.

Dear Attorney Gurvits,

Enclosed herewith you will find Notice of Special Meeting of Shareholders and Notice of Special Meeting of Board of Directors of Gold and Farb, Inc.

Please forward the Notices to your client, Mr. Pelikov.

The notice is given to your office, instead of Mr. Pelikov directly, in view of the fact that you have advised my client that your firm is legal counsel for Mr. Pelikov.

If it is your position that the Notices should be given to Mr. Pelikov directly in accordance with the By-Laws of Gold and Farb, Inc., and/or the Stockholders' Agreement, please advise the undersigned, in writing to vontimroth@gmail.com no later than the end of business on July 23, 2014.

Sincerely,

Vladimir A. von Timroth

VAT/dt
Encl.
cc:    Gold and Farb, Inc. via facsimile

## NOTICE OF THE SPECIAL MEETING OF STOCKHOLDERS

### Of

### GOLD AND FARB, INC.

**TO:   EUGENE PEKOKHOV**

Please take notice that pursuant to Article 1, Section 2 and of By-Laws of Gold and Farb, Inc., (hereinafter the "Corporation") a special meeting of shareholders has been called by the President of the Corporation, Lev Goldfarb.

**PLACE AND DATE OF MEETING:**

The meeting shall be held on Sunday, August 3, 2014, at 6:30 p.m. at 145-147 Broad Street, Lynn, MA 01902.

**PURPOSE OF THE MEETING:**

Election of Director(s) pursuant to Section 3.1 of Article 3 of the Stockholder's Agreement.

07/22/14

Lev Godfarb, President,
Director, Shareholder

## NOTICE OF THE SPECIAL MEETING OF THE BOARD OF DIRECTORS

Of

### GOLD AND FARB, INC.

TO:   EUGENE PEKOKHOV

Please take notice that pursuant to Article II, Section 7 and of By-Laws of Gold and Farb, Inc., (hereinafter the "Corporation") a special meeting of the Board of Directors has been called by the President of the Corporation, Lev Goldfarb.

PLACE AND DATE OF MEETING:

The meeting shall be held on Sunday, August 3, 2014, at 7:00 p.m. at 145-147 Broad Street, Lynn, MA 01902.

PURPOSE OF THE MEETING:

To discuss the current financial conditions of the Corporation and to authorize the filing of Chapter 11 Bankruptcy Petition in the U.S. Bankruptcy Court for the District of Massachusetts.

07/22/14

Lev Godfarb, President

# Exhibit
# 9

To Complaint Page 60 of 67

### VLADIMIR VON TIMROTH, ESQ.
ATTORNEY AT LAW
405 Grove Street, Suite 204
Worcester, MA 01605

Telephone (508) 753 2006                         Facsimile (774) 221 9146

July 23, 2014

Via facsimile (617) 928-1802

Val Gurvits, Esq.
Boston Law Group, P.C.
825 Beacon Street, Suite 20
Newton Center, MA 02459

Re:   Gold and Farb, Inc.

Dear Attorney Gurvits,

My client, Gold and Farb, Inc., is in receipt of your letter dated July 17, 2014. Under M.G.L. Ch. 156D, Sec. 16.02(c) a shareholder "may inspect and copy the records described in section [16.02(b)] only if: (1) the demand is made in good faith and for the proper purpose; (2) he describes with reasonable particularity [the] purpose and the records he desires to inspect; (3) the records are directly connected with the purpose; and (4) the corporation shall not have determined in good faith that disclosure of the records sought would adversely affect the corporation in the conduct of its business."

In view of the foregoing provisions of section 16.02(c) it is our position that your "notice of demand to inspect" fails in several respects. Firstly, it fails to describe with reasonable particularity the records Mr. Pelikov wishes to inspect and how each of the requested records is directly connected with the purpose. However, and more importantly, your purported "notice of demand to inspect" cannot possibly be construed as a demand made in good faith and for the proper purpose. To begin with, your letter does not state any purpose for the inspection other than you client's "intent to file suit" against the corporation and its officers and shareholders. In view of this, it has been determined that the notice of demand to inspect was not made for the proper purpose, other than to have a fishing expedition intended to buttress your, otherwise, groundless claim that my client committed fraud, embezzlement and tax evasion. Furthermore, given the fact that your client, Mr. Pelikov was not only a 25% shareholder but also an officer, director and the Secretary of the corporation, who signed various corporate documents, your claim on his behalf to the effect that he was deprived of his right to participate as a director rings hollow.

Furthermore, your client is well aware that the corporation is currently in the process of moving its business to a new location. In conjunction with this event, the Corporation, Mr. Goldfarb and your client, Mr. Pelikov, entered into a 10 year lease agreement which increases the corporate long turn liability to approximately $480,000.00 over the term of the lease. In addition, the Corporation has signed various loan and lease documents to finance the relocation and new equipment. These facts are well known to Mr. Pelikov as he has co-signed a five year equipment

VLADIMIR VON TIMROTH, ESQ.

July 23, 2014
Val Gurvits, Esq.
Page Two


lease with NationalFunding worth $120,000.00. He also co-signed the real estate lease. In view of the foregoing, the corporation determined that Mr. Pelikov's "notice of demand to inspect" taken in conjunction with his demand "that you immediately pay him $300,000.00" has not been made in good faith.

In view of the foregoing, my client respectfully declines to provide Mr. Pelikov access to the corporate records until such time, when he provides my client with a "notice of demand to inspect" which complies with the provisions of Section 16.02(c).

Finally, you should advise your client, that the shareholders and the board will conduct their respective special meetings at the time and place noticed to your office by fax on July 22, 2014. The purpose of the meeting of the board will be to discuss the filing for a Chapter 11 Bankruptcy Protection, in view of the fact that the Corporation appears to be both balance sheet insolvent, and now, after your client's demand for the immediate payment of $300,000.00 is unable to meet its obligations as they become due. In view of this, the commencement of Chapter 11 Reorganization appears to be the only viable option to preserve the going concern value of the corporation for the benefits of its creditors and equity holders.

Thank you for your attention to this matter.

Sincerely,

Vladimir A. von Timroth

VAT/dt
cc:     Gold and Farb, Inc. via facsimile

# Exhibit 10

# BOSTON LAW GROUP, PC

### ATTORNEYS AT LAW

825 BEACON STREET, SUITE 20
NEWTON CENTRE, MASSACHUSETTS 02459

Main (617) 928-1800                                                    Fax (617) 928-1802

Via facsimile 774-221-9146 - 2 pages

July 28, 2014

Vladimir Von Timroth, Esq.
405 Grove Street
Suite 204
Worcester, MA 01605

RE:    Eugene Pelikhov v. Gold and Farb, Inc.

Dear Attorney Von Timroth,

I write in response to your correspondence of July 22, 2014 and July 23, 2014. I respond to
certain issues you raise therein as follows:

1.      I note that most of Mr. Pelikhov's claims against Gold and Farb, Inc. and against Lev
Goldfarb, Alex Goldfarb, and Lydmila Rogalin are based on fraud and are therefore not
dismissible upon bankruptcy. To the extent that Mr Goldfarb believes that bankruptcy will help
him and his co-conspirators avoid liability for his fraud and his failure to account for taxes, that
strategy will fail.

2.      Mr. Pelikhov hereby withdraws each and every personal guaranty made by him on behalf
of Gold and Farb, Inc. I am told that one of those guaranties is for a bank credit line which has
not yet been used  Gold and Farb is hereby on notice not to use that credit line. Moreover, I am
certain that one of the contractual provisions of that credit line is that Gold and Farb's bankruptcy
constitutes a breach of the credit line. Accordingly, to the extent that Mr. Goldfarb willfully
causes Gold and Farb to be in breach of its contractual obligations, he shall be personally liable
for the injuries suffered by both the corporation and Mr. Pelikhov arising out of such breach

3.      Gold and Farb's refusal to grant access to its corporate records to Mr. Pelikhov is a
blatant violation of Massachusetts law. Moreover, it is clear to me that you simply failed to read
my letter in its entirety. How can you claim that we failed to specify the purpose of our request

1

when my letter explicitly states " Mr. Pelikhov demands the examination of the above-described information so as to ascertain the financial position of the Corporation and to determine the complete amounts due to him"?  Moreover, your claim that we failed to specify the requested documents with specificity is also clearly wrong.  We asked for very specific information as follows:

1. All monthly and annual statements received from banks, mutual funds or other financial institutions holding assets of the Corporation.
2. All monthly and annual financial statements of the Corporation, including income statements, balance sheets and cash flow statements.
3. All transaction (general ledger) records.
4. All check transaction logs.

Gold and Farb has two (2) days to confirm in writing that it will provide immediate unrestricted access to the above-referenced records.  Failure to do so will result in the filing of suit against Gold and Farb pursuant M.G.L. Ch. 156D Sec. 16.04, which will allow Mr. Pelikhov to collect the legal costs and expenses (including reasonable attorneys' fees) incurred in the action.

Kindly govern yourself accordingly.

Very truly yours,

Val Gurvits

cc:    E. Pelikhov

2

# Exhibit
# 11

## VLADIMIR VON TIMROTH, ESQ.
ATTORNEY AT LAW
405 Grove Street, Suite 204
Worcester, MA 01605

Telephone (508) 753 2006                    Facsimile (774) 221 9146

July 31, 2014

### FOR SETTLEMENT PURPOSES ONLY

Via facsimile (617) 928-1802

Val Gurvits, Esq.
Boston Law Group, P.C.
825 Beacon Street, Suite 20
Newton Center, MA 02459

      Re:    Gold and Farb, Inc.

Dear Attorney Gurvits,

      I have reviewed your response to my previous correspondence. Your analysis of the possible treatment of your client's debt in a Chapter 11 Bankruptcy case is formally incorrect and substantively superficial. In view of this, I believe it is necessary to give you a road map of what is likely to happen in the event you and your client force my client, Gold and Farb, Inc., to seek bankruptcy protection. I will omit for the sake of time all the procedural niceties which legal costs, which will become a first priority administrative claim in the case. First off, the filing of the bankruptcy case would lead to a rejection of the Shareholder's Agreement. Further, your client would have to make a claim in the case for both his alleged "fraud and embezzlement" and his "interest as a shareholder." Needless to say that in most reorganization cases the equity interest usually receives no dividend. So, if he is lucky, your client may receive stock in the emerging entity. With regards to claim of "fraud and embezzlement" it is most likely it would be disallowed as such claim is not against the corporation but, at best, against the individual principals of the company. Assuming for the sake of argument, that your client's claim survives the objection and is allowed to stand, your client will be required to commence a separate Superior Court action to liquidate the claim, i.e., to determine the exact amount and nature of the debt. Once such Superior Court action is resolved in your client's favor and the judgment is obtained, your client would have to file an Adversary Proceeding in the Bankruptcy Case, seeking determination that his debt is not dischargeable under 11 U.S.C. Sec. 523(a)(4). In the event your client is able to establish his debt, which represents the liquidated liability on the state court claim of fraud and embezzlement, it will be treated accordingly. Most likely, it is going to receive a stream of payments over the life of the plan, which can be in over 5 or even 10 years.

      Needless to say, one may argue that no such plan would be voted for by the Debtor's creditors, however, it appears that based on the current composition of the creditor's body it is likely that most of the creditors would vote for the plan and if the vote is against the plan, the case will convert to a Chapter 7.

**VLADIMIR VON TIMROTH, ESQ.**
Val Gurvits, Esq.
July 31, 2014
Page Two

Furthermore, your suggestions that the company and/or its management has unreported, misreported or underreported the sales, meals or payroll taxes, including trust fund portion, may lead to liability of your client to Gold and Farb, Inc., under officers and directors liability principals. Mr. Pelikov was and still is one of the two or three directors of the Corporation and the Secretary of the Corporation. It was his duty and responsibility owed to Gold and Farb, Inc., to either timely file and pay all taxes or, if he knew that the taxes have not been filed and paid, to seek immediate corrective action either as a member of the board or as a shareholder. In addition, your client may be deemed responsible by the taxing authority to pay any delinquent corporate taxes. Finally, if your client continues with his unreasonable demands, thereby forcing the Corporation into bankruptcy, the Corporation will assert a claim of recoupment against your client's claim against the Corporation. Gold and Farb, Inc.'s claim would be for any damages, including potential termination of the real estate lease, equipment lease or closing of the line of credit or any other that the creditors may undertake as a result of the bankruptcy filing.

We also understand that your client had made a substantial investment in the corporation, and it is our desire to treat Mr. Pelikov fairly and in good faith, while keeping in mind that Gold and Farb, Inc. is literally a mom and pop store which has value only as a going concern. The $300,000.00 or $175,000.00 of liquidity simply is not available. Any attempts to extract these funds from the company would only lead to a destruction of the shareholders' equity. With this in mind, I suggest that the best way to resolve this crisis is to discuss, without making threats, empty or otherwise, the ways to amicably ease the situation.

Finally, you will find enclosed herewith my client's balance sheets and P&Ls for FY 2011, 2012 and 2013. The 2014 reports have not yet been prepared. It is the opinion of the corporation that these documents are sufficient to answer your client's legitimate questions.

Thank you for your attention to this matter.

Sincerely,

Vladimir A. von Timroth

VAT/dt
Encl.
cc:      Gold and Farb, Inc. via facsimile